# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DANIEL CASARES and KARINA CASARES, )
)
      Plaintiffs, )
)
vs. ) No. 08 C 4198
)
OFFICER BERNAL, Star No. 12254, )
OFFICER SZUBSKI, Star No. 4443, )
OFFICER VERDIN, Star No. 2913, )
OFFICER LEACH, Star No. 4297, )
OFFICER WILLIAMS, Star No. 2999, )
OFFICER CALVO, Star No. 15753, )
OFFICER PARTYKA, Star No. 10596, )
and the CITY OF CHICAGO, )
)
      Defendants. )

      The deposition of RICHARD B. LAZAR, M.D., taken before Eileen Bailey, a notary public in and for the County of DuPage and State of Illinois, taken pursuant to the Federal Rules of Civil Procedure for the United States District Court, at Suite 555, 111 East Wacker Drive, Chicago, Illinois, on Friday, August 6, 2010, at the hour of 9:00 o'clock, a.m., pursuant to Agreement.

Reported For
PATTI BLAIR COURT REPORTERS, by
Eileen Bailey, CSR

Page 2

1  APPEARANCES:
2
   ALBUKERK & ASSOCIATES,
3  ( 111 East Wacker Drive,
   Suite 555,
4  Hinsdale, Illinois 60601), by:
   773 847-2600,
5  MR. J. NICOLAS ALBUKERK,
   appeared on behalf of the Plaintiffs;
6
7  ASSISTANT CORPORATION COUNSEL,
   ( City of Chicago, Department of Law,
8  30 North LaSalle Street,
   Suite 900,
9  Chicago, Illinois 60602), by:
   312 742-3902,
10 MR. SANJAY H. PATEL, and
   MR. BHAIRAV RADIA,
11   appeared on behalf of the Defendants.

Page 3

1           I N D E X
   WITNESS              EXAMINATION
2  RICHARD B. LAZAR, M.D.
   By Mr. Patel        4
3  By Mr. Albukerk     182
   By Mr. Patel        185
4
5          EXHIBITS
6  NUMBER          MARKED FOR ID
   Lazar Deposition Exhibits A, B, C    4
7
8
9      EXHIBITS ATTACHED

Page 4

1    ( Lazar Deposition Exhibits A, B and C
2    were marked for identification as of
3    8/6/10.)
4
5      RICHARD B. LAZAR, M.D.,
6  having been first duly sworn, was examined and
7  testified as follows:
8
9           EXAMINATION
10          BY MR. PATEL:
11
12    Q.  This is the deposition of Dr. Richard
13 Lazar, taken pursuant to notice, and the applicable
14 rules of Civil Procedure and rules of evidence
15 apply.
16    Dr. Lazar, would you please state your
17 full name for the record, and spell your last name,
18 please?
19    A.  Richard Beck Lazar, L-a-z-a-r.
20    Q.  Doctor, you understand you are here to
21 give a deposition?
22    A.  I do.
23    Q.  And that is related to the case of Daniel
24 Casares versus the City of Chicago and seven

Page 5

1  individual police officers?
2     A.  Yes.
3     Q.  And you have been retained by the
4  plaintiff, Daniel Casares, as an expert in this
5  case, is that correct?
6     A.  Correct.
7     Q.  Is that your understanding?  You have
8  testified at a deposition before?
9     A.  I have.
10    Q.  Have you ever testified at trial?
11    A.  I have.
12    Q.  Have you been qualified as an expert?
13    A.  What does that mean?
14    Q.  Does that mean -- essentially -- well, let
15 me ask you this.  When you testified at trial, was
16 it in state court or Federal court?
17    A.  I have testified in both.
18    Q.  Okay.  Did the court ever make a finding
19 that you were qualified to testified as an expert,
20 if you recall?
21    A.  I wouldn't recall that.  I mean, I was
22 never barred.
23    Q.  My next question would be have you ever
24 been disqualified as testifying as an expert, to

Page 26

1  in order to make a fist, is that correct?
2      A.  Correct, because the C8 muscles are below
3  C7 and you need -- finger flexion is C8.
4      Q.  Okay.  So if a person, let's say Daniel
5  Casares, for example, was able to make a fist with
6  his left hand, but not his right hand, what does
7  that mean to you?
8      A.  Given the hypothetical?
9      Q.  Yes.
10     A.  That would mean that he has some
11 preservation of C8 function in the left hand.
12     Q.  Okay.  In preparing your report you had
13 reviewed pertinent medical records relative to
14 Mr. Casares's medical condition, right?
15     A.  Yes.
16     Q.  Could you identify for me all of the
17 records that you have reviewed?
18     A.  Yes.  St. James Hospital, the Rehab
19 Institute of Chicago, Trinity Hospital, Chicago Fire
20 Department EMS records, and Lincoln Park Hospital.
21     Q.  Do you have a date range for these records
22 that you reviewed?
23     A.  I have the records.  I didn't memorize the
24 dates of all of them.

Page 27

1      Q.  That's okay.  Maybe if we could just put
2  on the record so I know precisely what it was that
3  you reviewed in preparing your report?
4      A.  Do you want me to go through these and say
5  this is a record from St. James Hospital dated
6  such-and-such?
7      Q.  Yes.
8      A.  Okay.  Discharge summary from St. James
9  Hospital dated 9/19/02.  At least that was the
10 discharge date.  Here is another discharge summary
11 from St. James Hospital, 9/19/02.  Outpatient
12 evaluation, Rehabilitation Institute of Chicago,
13 7/22/03.  Outpatient recheck, Rehab Institute of
14 Chicago, 8/18/03.  RIC -- can we call Rehab
15 Institute of Chicago RIC?
16     Q.  Sure.
17     A.  RIC dated 12/23/03.  RIC dated 2/3/04.
18 RIC dated 3/15/04.  RIC dated 8/18/03.  RIC dated
19 4/12/04.  RIC dated -- it looks like 2/13/04.  This
20 is an inner-disciplinary team discharge summary.
21 Actually, the discharge date is 5/3/04.  So that
22 would be the proper date.  Speech language
23 evaluation at RIC.  I am unable to determine the
24 date.  Okay.  Let me just clear something up.  When

Page 28

1  I spoke about this discharge summary report,
2  inner-disciplinary team discharge summary, that is
3  inclusive of all these, and then they should fall
4  under the same date, 5/3/04.  These reports from
5  speech and languages pathology, occupational
6  therapy, and physical therapy, they are part of that
7  whole summary, and the date of that is 5/3/04.  I
8  looked at inner-disciplinary team summary and care
9  plan from RIC, 2/13/04.  I think that was an
10 admission report that contains the various
11 disciplines of speech, occupational, and physical
12 therapy.  Chicago Fire Department.  Sorry, I am just
13 trying to read the date.  Looks like 10/9/06.
14 Advocate Trinity Hospital, 10/9/06.  Advocate
15 Trinity Hospital discharge summary from 9/16/06.
16 Advocate Trinity Hospital 10/10/06.  That is an
17 x-ray report of the right humerus.  Chest x-ray from
18 Advocate Trinity, 10/10/06.  Advocate Trinity CT
19 scan, 10/10/06 of the head.  Emergency record from
20 Advocate Trinity, 10/9/06.  Attending physician
21 report, 10/10.  I am sorry, it looks like -- yes,
22 10/10/06 from the attending physician at Advocate
23 Trinity.  10/10/06 from Advocate Trinity.  10/10/06
24 from Advocate Trinity Hospital, a CT scan of the

Page 29

1  head without contrast, and these look to be more
2  Advocate Trinity records from 10/10/06.  10/10/06,
3  Chicago Fire Department.  That is EMS.  Lincoln Park
4  Hospital discharge summary, 2/3/07.  Rehab Institute
5  again.  This is 10/29/08.  That's the medical
6  records.
7      Q.  What is your understanding of the date
8  when Daniel Casares sustained an injury that
9  resulted in his quadriplegia?
10     A.  8/15/02.
11     Q.  And the date of occurrence of this case?
12     A.  You mean the subject occurrence?
13     Q.  So this incident.  It's your understanding
14 that it occurred on October 9th, 2006?
15     A.  Correct.
16     Q.  And the records -- and then you had
17 received some records post 10/9/06 relative to
18 Mr. Casares, is that right?
19     A.  Correct.
20     Q.  I believe you had mentioned that there
21 were some records that you had that you reviewed
22 from 2007 and 2008?
23     A.  Correct.
24     Q.  Okay.  Where did you get these records

Page 30

1  from in your review of this case?
2     A.  From Mr. Albukerk.
3     Q.  Did you receive anything else other than
4  the medical records?
5     A.  Yes.
6     Q.  What else did you review?
7     A.  I received some pictures, photographs of
8  Daniel. I saw some photographs of police.
9     Q.  Did you bring those with you today?
10    A.  I did not.
11    Q.  Okay. You also reviewed some police
12 reports, is that right?
13    A.  Yes.
14    Q.  Do you know which police reports you had
15 reviewed?
16    A.  Not off the top of my head.
17    Q.  Do you remember the date range, or the
18 dates of those police reports? Were they related to
19 the incident for which you are giving an opinion,
20 the October 9th, '06, or is it from the car accident
21 that resulted in his disability?
22    A.  No. They were from October 9th, '06.
23    Q.  Okay. They were Chicago Police Department
24 reports?

Page 31

1     A.  Yes.
2     Q.  What I will do, at least at this point is,
3  I will ask you or ask Mr. Albukerk to help
4  facilitate supplementing your report so that I have
5  a complete list of all of the documents that you had
6  reviewed?
7     A.  Okay.
8     MR. PATEL: Because I think one of the -- Nick,
9  this is just related to discovery that we have had
10 in this case. I don't know what records you
11 obtained, and then you ultimately gave to Dr. Lazar.
12 I don't know if they are the same ones that I have
13 got.
14    MR. ALBUKERK: They are. They are exactly the
15 same.
16    MR. PATEL: Okay. A lot of times what ends up
17 happening, I will send a subpoena to the hospital
18 and I will get maybe an incomplete set, and you will
19 get a complete set.
20    MR. ALBUKERK: The only issue is the St. James
21 records. That is why he has only got the discharge
22 summary. Other than that, everything is the same.
23 I know you were working on that issue. As far as
24 the police reports, those are exactly the same

Page 32

1  police reports that we have all been working with.
2  If you want me to get copies of them I will.
3     MR. PATEL: I guess what I will ask, whatever
4  you have given to the doctor for review, can I get a
5  set of that?
6     MR. ALBUKERK: Of course. You have already got
7  it, but I will get you another set. That's no
8  problem.
9     MR. PATEL: The only reason why I ask, I am not
10 sure what police reports the doctor looked at. Was
11 it the arrest reports, because there were multiple
12 arrest reports?
13    MR. ALBUKERK: It was more than just the arrest
14 reports.
15    MR. PATEL: Was it the case report, was it the
16 tactical response report, officer battery reports?
17 I am not sure exactly. There is a bunch of them. I
18 just want to make sure I know what the doctor
19 reviewed.
20    MR. ALBUKERK: Do you want the pictures,
21 because the pictures are exactly the same stuff that
22 we have already given you as well?
23    MR. PATEL: Yes, because there were a lot of
24 pictures, so I am not exactly sure what pictures.

Page 33

1  Were they the pictures taken by the evidence tech,
2  or pictures taken by Mr. Casares?
3     MR. ALBUKERK: Evidence tech, and pictures of
4  Dan.
5     MR. PATEL: The plaintiff's pictures?
6     MR. ALBUKERK: The plaintiff's pictures, right.
7     MR. PATEL: Q. Doctor, do you think there
8  could have been anything else that you could have
9  had that would have better assisted you in preparing
10 your report?
11    A.  No.
12    Q.  How about an examination of Daniel
13 Casares, would that have assisted you?
14    A.  Not at this point. I mean, this incident
15 occurred in 2006, and it's now 2010, and very
16 likely, given the nature of his injury and, you
17 know, the complications that arise from such an
18 injury, I am talking about the injury from 8/15/02,
19 being quadriplegic, his exam would be different than
20 it would have been back in 2006. So really the best
21 thing would have been to present in 2006 and examine
22 him to know what his actually physical capabilities
23 were at that time of this subject occurrence. Now,
24 he is probably less capable than he would have been

Page 34

1  back in 2006. His contractures are probably worse.
2  He is probably not quite as strong as he was back
3  then. So that is what my worry would be about
4  drawing too much in the way of conclusions and
5  opinions from an examine that is in the present
6  tense.
7      Q. Explain to me the causes or the reasons
8  why an exam today of Mr. Casares would not be
9  beneficial or help assist you in preparing your
10 report, versus if you had the opportunity to examine
11 him in 2006?
12     A. Because his condition is likely worse.
13     Q. How is it worse? How does it worsen?
14     A. How does it worsen, because he gets
15 weaker, the contractures get worse, the spasms get
16 worse over time. In other words, the strength in
17 his arms is not what it was in 2006. I would be
18 looking at him in a probably weakened state, and
19 less capable state.
20     Let me give a specific example. So a
21 contracture means that there is a loss of range of
22 motion of a joint that is fixed, and when you have
23 spastic quadriparesis, or quadriplegia, like he
24 does, you are subject to that occurring in any

Page 35

1  mobile joint of your upper extremities. So I would
2  expect over the four years that -- nearly four years
3  at this point, that he would have, because of his
4  weakness, which is not improved, is irreversible, I
5  mean from an injury from 2002, and because of the
6  progressive nature of fixed deformities and how you
7  lose range of motion over time, that he would not
8  have been as capable today as he was in 2006. It
9  would have probably -- if I would make the incorrect
10 assumption that he was as capable, at what I am
11 looking at 2010 is exactly the same person as I
12 would have seen in 2006, that would be -- that would
13 lead me to actually be more biased in a way that
14 would hurt your case in defending these police
15 officers than it would help Mr. Casares.
16     Q. But that's an assumption you are making
17 based upon your review of the records, and the way
18 Daniel presented himself at the various times he did
19 when you reviewed the records, is that correct?
20     A. It's an assumption that is based upon, you
21 know, 25, 26 years of experience in dealing with
22 quadriplegia, knowing what the complications are,
23 knowing that they get -- you know, there is a slow
24 deterioration in their function, it is an

Page 36

1  assumption.
2      Q. Can you define spasticity for me, please?
3      A. Sure. Spasticity is an increase
4  predominantly unidirectional in resistance to
5  passive range of motion of a specific joint. So if
6  you want me to explain that?
7      Q. Yes, please.
8      A. You look puzzled.
9      Q. First I got the definition, now, I will
10 ask for the explanation?
11     A. Okay. Let's talk about the biceps curl,
12 which is what weight lifters do, biceps curls. So
13 in his case, what happens is when you take the --
14 you put one hand under the elbow, and you take the
15 other hand as a examining physician, and you grab
16 his hand and you try to flex and extend the elbow
17 by, you know, putting the biceps through and triceps
18 through range of motion, you find resistance instead
19 of a normal fluid motion. You find resistance that
20 is predominantly unidirectional. So usually the
21 resistance would be an extension, as opposed to
22 flexion.
23     So it's like -- they call it clasped
24 knife, because it's kind of like a pocket knife.

Page 37

1  You open up a jack knife, and first there is
2  resistance predominantly in one direction, and then
3  you open it up and it snaps open, but then when you
4  do the other direction and you close the knife, then
5  it does so without any resistance and that snaps
6  shut. So that is what spasticity is. It's
7  predominantly unidirectional.
8      Q. Is it particular to involuntary or
9  voluntary movements?
10     A. Okay. That is a very good question. So
11 it is particular to voluntary movements, but it is
12 tested by doing passive range of motion. So when
13 you test, the patient is not actually participating
14 in the exam. You are doing all the work. You don't
15 ask the patient to flex and extend the elbow. You
16 say relax your arm, I am going to put my palm on one
17 hand of your elbow, and I am going to move your hand
18 back and forth. You don't ask the patient to do
19 that, because that interferes with the testing.
20 It's all passive. The examiner does it, the patient
21 doesn't participate.
22     In regards to the issue of involuntary
23 movements, people that have spasticity have
24 involuntary movements that are associated with this

Page 110

1  MR. ALBUKERK: 1996.
2  MR. PATEL: Was it 1996? I wasn't sure what
3  the year was.
4      A.  So I mean, I didn't say he was without
5  resources, but I guess what I am saying, you know,
6  you don't measure that in terms of who you live
7  with, or what you own, you measure it really in --
8  here is a man that is C7 quadriplegic complete
9  ASIA-A. So he needs help and support in doing the
10 things 24 hours a day, getting to appointments,
11 turning, you know, turning in bed, you know, helping
12 with the proper catheter care. I just -- I didn't
13 see that the medical records reflected that he had a
14 great support system. I mean, that is all I really
15 have to say about it.
16     Q.  Okay. Did your review of the medical
17 records reveal drug and alcohol use by Daniel
18 Casares?
19     A.  I didn't see anything in the medical
20 records about that. I am not saying he did or
21 didn't. I am just saying I didn't see anything
22 listed in the records that said this patient is an
23 alcoholic, or this patient is a chronic substance
24 abuser.

Page 111

1      Q.  Would range of motion be affected -- on
2  any given day, would a C7 quadriplegic's range of
3  motion be affected by alcohol and drug ingestion?
4      A.  Well, alcohol wouldn't affect your range
5  of motion, and the drugs -- I mean, it depends on
6  what drugs you are talking about.
7      Q.  Let's say cannabis.
8      A.  Cannabis might induce a little bit more
9  relaxation, but shouldn't have a great -- and
10 actually helps people with pain from contractures,
11 but it shouldn't have a great affect, a tremendous
12 affect on range of motion.
13     Q.  How about cannabis and cocaine?
14     A.  I am unaware of any relationship of
15 cocaine to someone's range of motion, overall motor
16 functioning as a quadriplegic.
17     Q.  How about -- I have a feeling this is
18 going to be a stupid question, but I am going to ask
19 anyway. Based upon your review of the records, you
20 believe Daniel's injury would necessarily mean he
21 cannot form a fist. Let's say he was using drugs,
22 would he then be able to form a fist?
23     A.  Well, it's not a stupid question. It's
24 just one I don't understand. Could you explain a

Page 112

1  little bit?
2      Q.  So Daniel is a C7 quadriplegic?
3      A.  Right.
4      Q.  So based upon that, and your review of the
5  records, you are saying that you don't believe he
6  could form a fist, right?
7      A.  Correct.
8      Q.  With either hand?
9      A.  Correct.
10     Q.  So let's say a C7 quadriplegic -- there is
11 nothing particular about Daniel that causes you to
12 say he can't form a fist, versus other C7
13 quadriplegics?
14     A.  Correct.
15     Q.  So let's say a C7 quadriplegic smokes
16 marijuana laced with cocaine, or smokes marijuana
17 and snorts cocaine, or whatever combination, they
18 have cannabis and cocaine present in their system.
19 Are they now able to do things that they wouldn't
20 have otherwise been able to do? And I don't mean
21 extraordinary things, like getting up and able to
22 walk, I mean things like forming a fist?
23     A.  The answer is no, absolutely not.
24     Q.  Okay. The absolutely part, I had a

Page 113

1  feeling you were going to say absolutely, which is
2  why I said I think this is going to be a stupid
3  question, but I had to ask you.
4      A.  That's fine.
5      Q.  You go on to state that the records are
6  replete with entries that identify Mr. Casares
7  suffering from muscle spasms and severe spasticity.
8  Those would be the records from St. James or RIC,
9  correct?
10     A.  Predominantly RIC.
11     Q.  And that would be muscle spasms and severe
12 spasticity of the lower extremities?
13     A.  Correct.
14     Q.  Because you previously testified that
15 there was nothing that you saw that would indicate
16 particular spasms related to the upper extremities?
17     A.  Correct.
18     Q.  Okay. The result from the unopposed
19 action of upper motor neuron brain impulses acting
20 on a severely injured spinal cord. What does that
21 mean?
22     A.  Okay. So basically you have a transection
23 of a spinal cord, the brain has an influence on --
24 through what we call upper motor neurons. It tells